UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

V.R. ENTERTAINMENT, VICKASH MANGRAY,
JEFF MANGRAY, and MOONIE MANGRAY,

          Plaintiffs,

vs.

CITY OF ANN ARBOR, CITY OF ANN ARBOR
POLICE DEPARTMENT, CITY OF ANN ARBOR
CHIEF OF POLICE BARNETT JONES,
ANN ARBOR CITY ADMINISTRATOR STEVE
POWERS, and PREVIOUS CITY ADMINISTRATOR
ROGER FRASER, jointly and severally,

          Defendants.
_____/

Civil Action No.
12-cv-10203

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

## OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION TO DISMISS (Dkt. No. 10)

V.R. Entertainment, Vickash Mangray, Jeff Mangray, and Moonie Mangray (collectively, "Plaintiffs") are the owners of a nightclub known as the Dream Nite Club, located in the City of Ann Arbor. On January 17, 2012, Plaintiffs filed a Complaint in this Court alleging civil rights violations arising under 42 U.S.C. § 1983 by the City of Ann Arbor and its Police Department, as well as Chief of Police Barnett Jones, Ann Arbor City Administrator Steve Powers, and previous Ann Arbor City Administrator Roger Fraser (collectively, "Defendants"). (Dkt. No. 1.)

On February 17, 2012, Defendants filed a Motion to Dismiss for Failure to State a Claim. (Dkt. No. 10.) Plaintiffs filed a Response on March 19, 2012. (Dkt. No. 12.) Defendants filed a Reply on April 5, 2012. (Dkt. No. 13.) The Court held a hearing on May 30, 2012.

1

For the reasons stated below, the Court will GRANT Defendants' Motion and DISMISS the action WITH PREJUDICE.

## I. BACKGROUND

The facts alleged in the Complaint are accepted as true for purposes of this motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009).

Plaintiffs Vickash, Jeff, and Moonie Mangray are Asians of Indian descent. Plaintiffs allege that the patrons of the Dream Nite Club are generally African-American, Asian, and Latino. (Compl. ¶ 8.)

On May 29, 2011, Defendant City of Ann Arbor filed a nuisance action against Plaintiffs in Washtenaw County, Michigan, trial court. This state-court action, referenced in the instant Complaint at ¶¶ 10-14,[1] alleged that the Defendant Ann Arbor Police Department "has received more than 200 calls for police service at the [Dream Nite Club,]" and that "[i]n every year, at least from 2001 through 2009, the business has been found responsible for and/or has admitted to violations of its liquor license and the Michigan liquor control code of 1998, MCL 436.1101, et seq." (Defs.' Mot. Ex. 2, State Court Compl. ¶¶ 21-22.) Two prior nuisance actions have been filed against Plaintiffs by Defendant City of Ann Arbor. The first nuisance action, filed on September 16, 2009, was voluntarily dismissed on January 20, 2010, after no further egregious incidents occurred at Plaintiffs' nightclub. (State Court Compl. ¶¶ 35-37.) A second nuisance action was filed by Defendant City of Ann Arbor on February 19, 2010, which was also voluntarily dismissed one year later in February 2011. (State Court Compl. ¶¶ 38-40.) Prior to dismissal of the second nuisance

---

[1]Matters referenced in the complaint and central to Plaintiffs' claim may be properly considered on a motion to dismiss. *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542 (6th Cir. 2012).

2

action, the Dream Nite Club had been closed for approximately six months. (State Court Compl. ¶ 39.)

The third state-court action, filed on June 2, 2011, specifically alleged the following as a basis for Defendant City of Ann Arbor's nuisance claims:

- On September 12, 2009, at approximately 10:40 p.m., Ann Arbor police were dispatched to the Dream Nite Club because the line to enter the club was blocking the entrance to a public parking garage located next to the club as well as the street in front of the nightclub. "There were also complaints of alcohol consumption and rowdy behavior taking place inside the [parking] structure by the waiting crowd." (State Court Compl. ¶ 44.) Police shut down the road in front of the nightclub and disbursed the crowd.

- At approximately 1:10 a.m. on September 12, 2009, Ann Arbor police returned to the Dream Nite Club because the crowd had re-formed in front of the nightclub and was again blocking the road. Several members of the crowd also engaged in physical altercations, which required additional police interaction. (State Court Compl. ¶ 45.)

- On January 31, 2010, at approximately 1:57 a.m., Ann Arbor police were dispatched to the Dream Nite Club after receiving reports of groups of people fighting in the road and in the parking structure adjacent to the club. The size and volatility of the crowd outside of the nightclub required 13 of 16 police officers working that night to report to the scene, in addition to police officers from the University of Michigan Department of Public Safety. Ann Arbor police also requested an ambulance, and allowed vehicles to leave the parking structure without paying to quickly clear vehicles from the area. It took 40 minutes for the officers to clear the area. (State Court Compl. ¶ 49-55.)

- On May 1, 2011, a person was seriously injured at the Dream Nite Club after being assaulted with a knife by another patron. (State Court Compl. ¶ 26.)

- On May 29, 2011, an Ann Arbor police officer observed a person in a parking lot adjacent to the Dream Nite Club firing a gun. The officer arrested the individual and recovered the gun. Ann Arbor police officers investigating the incident were informed that Dream Nite Club patrons had been involved in a fight inside the nightclub, and that the fight had continued after they exited. Officers also discovered that one individual had been shot in the arm and another individual had suffered serious injuries after being assaulted. Two additional guns were recovered during the investigation. (State Court Compl. ¶¶ 27-31.)

Plaintiffs allege that the May 29, 2011 shooting is not attributable to the nightclub, because it occurred in the United States Postal Service parking lot, which is adjacent to the Dream Nite Club,

3

and because it occurred after the nightclub was closed. However, Plaintiffs do not address the other incidents in their Complaint.

After initiation of the third lawsuit in state court on June 2, 2011, the Dream Nite Club was shut down for several weeks pursuant to a temporary restraining order, sought by Defendant City of Ann Arbor and issued by the state court. The nightclub was eventually permitted to reopen, but was required to temporarily employ a court-appointed security receiver. (Defs.' Mot. Ex. 7, Order Dissolving TRO.)[2] Pursuant to the court order, the security receiver authored a report, dated July 25, 2011, that concluded as follows:

> It is my opinion and suggestion that the club be painted. The floors need to be cleaned and new carpet installed. The washrooms need to be cleaned and all fixtures brought up to working order.
>
> The security staff should wear a uniform. A white button down, collared shirt, black dress pants, black dress shoes and no hats. The staff needs to correct their language. Perhaps, further training would be helpful.
>
> The club rules need to be strictly enforced.
>
> It is my belief, after talking to management and patrons, that the club should be college only. Student ID must be presented to enter.
>
> The issues with the parking structure need to be addressed by the City of Ann Arbor. It appears that there have been many problems associated with the parking structures. Recent publically reported crimes within the structures include assaults, robberies, criminal sexual assaults, drug and alcohol consumption, prostitution and other related events. Parking structure staff should report illegal activity in a consistent and timely manner. Additional police and/or security presence in the parking structure would be of value to club owners, patrons and the general citizenry.

---

[2]This document is referenced and incorporated into the Complaint at paragraph 12.

(Defs.' Mot. Ex. 8, Security Receiver Report 3.)[3]

Plaintiffs allege that, in addition to the above lawsuits, Defendants have focused extraordinary police attention on the nightclub, including parking police vehicles directly in front of the nightclub. Plaintiffs also allege that Defendants have brought unjustified actions before the Michigan Liquor Control Commission ("MLCC"). Plaintiffs allege that Defendants have taken all of the above actions because Plaintiffs, and many of the Dream Nite Club patrons, are racial minorities.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must view "all well-pleaded material allegations of the pleadings of the opposing party . . . as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (citation omitted).

## III. ANALYSIS

Plaintiffs allege the following causes of action against Defendants:

> Count I: Violation of 42 U.S.C. § 1983;
> Count II: Violation of 42 U.S.C. § 1985;
> Count III: Fourth and Fourteenth Amendment Violations;
> Count IV: Eighth Amendment Violations;
> Count V: Intentional Infliction of Emotional Distress;
> Count VI: Conspiracy.

At the May 30, 2012 hearing on this matter, Plaintiffs stipulated to the dismissal of the Count IV Eighth Amendment violations. Defendants argue that the remaining five claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), because they are not

---

[3] This document is referenced and incorporated into the Complaint at paragraph 13.

supported by the facts alleged in the Complaint and because they fail to state plausible claims for relief. Defendants also argue that they are entitled to qualified immunity.

**A. Adequacy of Plaintiffs' Factual Allegations**

Defendants rely on *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in arguing that Plaintiffs' conclusory factual allegations fail to show that Defendants acted based on racial animus, rather than the "more likely explanation[]" that Defendants' actions were based on protecting the public from violence and nuisance. *See id.* at 681; *see also Bell Atlantic v. Twombly*, 550 U.S. 544, 567-68 (2007) (holding that the facts alleged in support of the plaintiffs' antitrust conspiracy claim could not survive against the "obvious alternative explanation" that "the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing."). Defendants argue that at most, Plaintiffs' factual allegations show only that Plaintiffs and their patrons are racial minorities, and that Defendants responded to crime at the Dream Nite Club, but not that Defendants acted with any racial animus.

The Complaint alleges that Defendant City of Ann Arbor filed a nuisance action against the Plaintiffs after "an alleged altercation and shooting that occurred in the vicinity of the Plaintiffs night club [sic]." (Compl. ¶ 10.) Plaintiffs do not deny that this shooting did actually occur, but instead allege that it took place adjacent to the Dream Nite Club in a United States Post Office parking lot, sometime after the nightclub closed. After this incident, Plaintiffs allege that Defendants "routinely evidenced surveillance on the club as evidenced by parked Police vehicles directly in front of the Plaintiffs club." (Compl. ¶ 14.) Plaintiffs also allege that Defendants "maliciously brought an action against the Plaintiffs" in the MLCC as a result of the May 29, 2011 shooting. (Compl. ¶ 15.)

These facts do not suggest that Defendants acted with racial discrimination. Rather, the most obvious explanation for the above facts is that, after a serious, violent crime occurred in a lot directly adjacent to Plaintiffs' nightclub, Defendant City of Ann Arbor attempted to decrease the chances of a repeat incident by increasing police presence in the area around Plaintiffs' nightclub, and by addressing possible issues with the nightclub's management through a nuisance action and an action with the MLCC.

The Supreme Court noted in *Iqbal*:

> It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the [September 11, 2001] attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims.

*Iqbal*, 556 U.S. at 682.

Likewise, in the instant matter, Defendant City of Ann Arbor's increase in police activity outside of Plaintiffs' nightclub after a violent incident may have incidentally impacted the racial minorities who happen to patronize Plaintiffs' nightclub, but the purpose of increasing the police presence was not to target racial minorities. The facts alleged impel the conclusion that police activity increased as a result of crime at and in the vicinity of the nightclub. Thus, Plaintiffs' conclusory allegations of racial animus "are . . . not entitled to be assumed true." *Id.* at 681.

Inferring racially discriminatory intent from the sequence of events alleged in the Complaint, as Plaintiffs ask the Court to do, requires an inferential leap that is not supported by the facts. *See Iqbal*, 556 U.S. at 682 ("On the facts respondent alleges the arrests . . . were likely lawful and justified by [petitioner's] nondiscriminatory intent . . . . As between that 'obvious alternative explanation' for the arrests, . . . and the purposeful, invidious discrimination

respondent asks us to infer, discrimination is not a plausible conclusion." (quoting *Twombly*, 550 U.S. at 567)). Accordingly, Plaintiffs have failed to state sufficient factual content for the Court to infer any unlawful discriminatory intent by Defendants.

*1. 42 U.S.C. § 1983 claim*

The Complaint alleges that Defendants "owed plaintiff a duty under 42 U.S.C. § 1983" not to discriminate against the Plaintiffs on the basis of race. (Compl. ¶ 21-22.) Defendants argue that Plaintiffs have failed to state a § 1983 claim because they have not alleged what constitutional rights Defendants allegedly violated. "Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." *Flint ex rel Flint v. Kentucky Dept. Of Corrections*, 270 F.3d 340, 351 (6th Cir. 2001).

Plaintiffs allege violations of their Fourth and Fourteenth Amendment rights in Count III. Because the claimed violations of racial discrimination properly arise under these Amendments, Count I is unnecessarily duplicative and fails to state a claim upon which relief can be granted. It will therefore be dismissed.

*2. 42 U.S.C. § 1985 claim*

> To assert an actionable claim under § 1985(3), a claimant must show that: 1) the defendants conspired "for the purpose of depriving, either directly or indirectly, any person or class of persons of the qual protection of the laws, or of equal privileges and immunities under the laws;" and 2) the defendants committed acts that deprived the claimant "of having and exercising any right or privilege of a citizen of the United States."

*Bartell v. Lohiser*, 215 F.3d 550, 559 (6th Cir. 2000). Plaintiffs must also establish "some racial, or perhaps otherwise class-based, invidiously disrminatory animus." *Id.* (quoting *United Brotherhood of Carpenters and Joiners of America v. Scott*, 463 U.S. 825, 829 (1983)).

Plaintiffs' § 1985 claim alleges as follows:

> Plaintiffs are of Indian decent [sic] and their clientele is Asian, Latino and African American.
>
> Defendant Police and City officials have egregiously traumatized the Plaintiffs by utilizing their police force to harass and intimidate plaintiffs' reminiscent of the 1960's civil rights clashes, while failing to prosecute other similarly situated businesses within the city that have actually had repeated fights and injuries to patrons.
>
> The actions and antics of the Defendants clearly demonstrate that their motives are racially and ethnically motivated against the Plaintiff so as to inflict extreme humiliation, embarrassment and terror so that they are forced to close their business and prevent the diversity in race and national origin that is a hallmark of Ann Arbor, Michigan.

(Compl. ¶¶ 26-28.)

As noted *supra*, Plaintiffs have failed to plead facts from which the Court can reasonably conclude that Defendants acted with any invidious discriminatory intent. Furthermore, Plaintiffs have failed to allege any facts evidencing a conspiracy among the Defendants. Specifically, Plaintiffs have not plead that any agreement existed among the individual Defendants to deprive Plaintiffs of their constitutional rights. Accordingly, because Plaintiffs have failed to allege sufficient facts to support all of the elements of a § 1985 claim, Count II of the Complaint must be dismissed.

*3. Fourth and Fourteenth Amendment Violations claim*

Plaintiffs allege that Defendants deprived them of (1) their right to liberty under the substantive component of the Due Process Clause of the Fourteenth Amendment, and (2) their right to fair and equal treatment under the Fourteenth Amendment. Although it is included in the title to their claim, Plaintiffs do not allege a specific violation of the Fourth Amendment.

"Substantive due process . . . protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988). Governmental action that impairs substantive due process rights is reviewed "only for arbitrariness or capriciousness." *Id*. "Substantive due process claims involve allegations of (1) deprivations of a particular constitutional right and (2) actions that 'shock the conscience.'" *Midkiff v. Adams County Regional Water District*, 409 F.3d 758, 769 (6th Cir. 2005) (citation omitted).

The facts alleged by Plaintiffs cannot support a substantive due process claim. Specifically, even taking the factual allegations in the Complaint as true, Plaintiffs have failed to allege facts showing that Defendants' behavior "shocks the conscience." As noted *supra*, the factual allegations show only that Defendant City of Ann Arbor increased police activity, filed a negligence action, and brought an action before the MLCC only after a violent incident occurred in the vicinity of Plaintiffs' nightclub. Increasing police activity in an area with a previous violent incident, and initiating actions against a business with a history of violent incidents, is not behavior that shocks the conscience. *See County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (noting that conduct that "shocks the conscience" must be "so 'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency[,]" or "interferes with rights 'implicit in the concept of ordered liberty.'") (citations omitted).

Plaintiffs also allege violations of their Fourteenth Amendment right to equal protection. "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Board of*

*Com'rs, Hamilton County, Ohio*, 430 F.3d 783, 788 (6th Cir. 2005).

Plaintiffs allege that Defendants "fail[ed] to prosecute other similarly situated businesses within the city that have actually had repeated fights and injuries to patrons." (Compl. ¶ 27.) However, Plaintiffs have not pled any facts showing what businesses were similarly situated, or how they were similarly situated. Such legal conclusions, without any factual support, are not sufficient to survive a 12(b)(6) motion. *See Iqbal*, 556 U.S. at 663 (noting that "threadbare recitals of a cause of action's elements, supported by mere conclusory statements" are not sufficient to withstand a Rule 12(b)(6) motion). Plaintiffs have also failed to allege sufficient facts showing that they were targeted for disparate treatment on the basis of their race and the race of their patrons. Plaintiffs Fourth and Fourteenth Amendment claims must therefore be dismissed.

*5. State law claims*

Plaintiffs allege intentional infliction of emotional distress and conspiracy claims. As to Defendants City of Ann Arbor and the Ann Arbor Police Department, these claims are barred by Michigan's governmental immunity statute, M.C.L. § 691.1407(1). "Absent a statutory exception, a governmental agency is immune from tort liability when it exercises or discharges a government function." *Maskery v. Board of Regents of Univ. of Michigan*, 468 Mich. 609, 613 (2003). "[A] city's operation of a police department is a governmental function." *Bennett v. Detroit Police Chief*, 274 Mich. App. 307, 315-16 (2006).

Furthermore, MCL § 691.1407(5) provides that "the elective or highest appointive executive officials of all levels of government are immune from tort liability for injuries to

persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." However, this immunity only applies where the allegedly tortious actions fall within the officials' executive authority. *American Transmissions, Inc. v. Attorney General*, 454 Mich. 135, 141 (1997).

> Whether the highest executive official of a local government was acting within his or her authority depends on a number of facts, including the nature of the acts, the position held by the official, the local law defining the authority, and the structure and allocation of powers at that particular level of government.

*Petipren v. Jaskowski*, 294 Mich. App. 419, *3 (2011).

Defendants City of Ann Arbor Chief of Police Barnett Jones, City of Ann Arbor Administrator Steve Powers, and former City of Ann Arbor Administrator Roger Fraser, are entitled to immunity under § 691.1407(5), if they acted within their official authority in taking the actions alleged in the Complaint.

Plaintiffs argue that, because Defendants acted with "overt racism," they were not acting within the scope of their official authority. (Pls.' Resp. 15.) However, Plaintiffs have not alleged any facts showing that Defendants acted with overt racism. Rather, it appears Defendants were fully within their official authority when they decided to increase police presence around Plaintiffs' nightclub, and pursue a nuisance action against the nightclub, after a series of violent incidents occurred in the immediate vicinity of the club. Accordingly, Defendants are entitled to governmental immunity pursuant to § 691.1407(5).

## B. Plaintiffs' Request to Amend

On the last page of their Response, in their requested relief, Plaintiffs state that they should be given leave to amend the Complaint. Plaintiffs have not attached a proposed Amended

Complaint to their Response, as required by Local Rule 15.1. Plaintiffs also do not state any additional facts they can allege that will allow their claims to survive a subsequent motion to dismiss. The Court thus finds that granting leave to amend at this time would be futile and would result in undue delay. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Accordingly, leave to amend is denied.

## IV. CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendants' Motion to Dismiss, and **DISMISS** the action **WITH PREJUDICE**.

SO ORDERED.

Dated: 6-22-12
Detroit, Michigan

_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE